IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **CANATELO, LLC**<br><br>        **Plaintiff,**<br><br>    **v.**<br><br>**TRENDnet, Inc.**<br><br>        **Defendant.** | **Civil No. 3:13-cv-01093 (PAD)** |

### CLAIM CONSTRUCTION ORDER

Delgado-Hernández, District Judge

On February 5, 2013, Plaintiff Canatelo, LLC ("Canatelo") filed the instant lawsuit against Defendant TRENDnet, Inc. ("TRENDnet"), asserting certain claims of its United States Patent Nos. 6,476,858 ("the '858 Patent") and 7,310,111 ("the '111 Patent") (collectively, "Patents-in-Suit") (Docket No. 1). On April 30, 2014, Canatelo and TRENDnet jointly submitted a claim construction briefing schedule, which was adopted by this court in the Case Management Order issued on May 12, 2014 (Docket Nos. 55, 60). This court also issued an Order directing the parties to focus the claim construction oral arguments set for January 14, 2015 on eight terms most likely to be dispositive of this action (Docket No. 90). Having considered all the materials submitted by the parties in their motions and the Markman hearing, this court is now ready to construe the eight terms currently at issue.

### I.    STANDARD OF REVIEW

Infringement analysis encompasses a two-step process where the court must first determine the meaning of disputed claim terms and then compare the accused device to the claims as construed. Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed.Cir. 1995),

aff'd, 517 U.S. 370 (1996)). With regards to the first step – the construction of a patent, including terms of art within its claim – the Supreme Court recently emphasized that this is a matter not for a jury but exclusively for the court to determine. Teva Pharms. v. Sandoz, 135 S.Ct. 831, 835 (2015) (citing Markman v. Westview Investments, 517 US 370, 372 (1996)). "That is so even where the construction of a term of art has 'evidentiary underpinnings.'" Id.[1]

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citing Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A claim construction analysis, then, must begin with the claim language itself; it is the language the patentee has chosen to feature and distinctly claim the subject matter which the patentee regards as his invention. Innova/Pure Water, Inc., 381 F.3d at 1116 (citing Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed.Cir. 2001)).

The court must, where possible, give claim terms their "ordinary and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313; see, ACTV, INc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed. Cir. 2003). This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art. Id. To determine the ordinary and customary meaning of a claim term, courts turn to publicly available sources that show what a person of skill in the art would have understood disputed claim language to mean.

---

[1] Accordingly, this Order is solely for interpreting the meaning of the claim language. The disputed terms so construed shall not be viewed by the parties to mean that this court takes any position on the issues of infringement or invalidity.

Id. at 1314. These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id.

Of these sources, courts have emphasized that the specification is highly relevant to the claim construction analysis and is usually dispositive – "the single best guide to the meaning of a disputed term." Am. Piledriving Equip., Inc. v. Geoquip, Inc., 637 F.3d 1324, 1333 (Fed. Cir. 2011). Given that claims are part of a fully integrated written instrument that consists principally of a specification that concludes with the claims, the claims must be read in view of the specification, of which they are a part. Phillips, 415 F.3d at 1315 (citing Markman, 52 F.3d at 979). For claim-construction purposes, the written description of the invention included in the specification may act as a sort of dictionary, which explains the invention and may define terms used in the claims. Id.

Even if the claims must be read in view of the specification, however, limitations from the specification are not to be read into the claims. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1326 (Fed. Cir. 2002). This is so, because it is the function of the claims, not the specification, that sets forth the limits of the patentee's invention. Otherwise, there would be no need for claims. SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).

Likewise, a patentee's choice of embodiments can shed light on the intended scope of the claim, but a patent claim term is not limited merely because the embodiments in the specification all contain a particular feature. C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 865 (Fed. Cir. 2004). Conversely, a construction that excludes a preferred embodiment is rarely, if ever,

correct and would require highly persuasive evidentiary support. Id.; Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996).

As previously mentioned, the court can also consider the prosecution history of the patent, which may include any express representations made by the applicant regarding the scope of the claims. This is often of critical significance in ascertaining the true meaning of the language used in the patent claims. Vitronics Corp., 90 F.3d at 1582-83; Markman, 52 F.3d at 980. Furthermore, while "the prosecution history can and should be used to understand the language used in the claims, it too cannot 'enlarge, diminish, or vary' the limitations in the claims." Markman, 52 F.3d at 980 (citations omitted).

## II.   DISCUSSION

Both Patents-in-Suit are entitled "Video Monitoring and Security System." Although the scope of the claims set forth in the '858 Patent and '111 Patent may appear to be somewhat different, the parties do not dispute that disclosures made in the specification of the Patents-in-Suit are identical, as pointed out by TRENDnet, and acknowledged by Canatelo.[2] As such, this court shall use the disclosure made in the earlier patent, the '858 Patent, as the specification reference for purpose of this claim construction analysis. For referencing particular locations by the column and line numbers, those shall be the '858 Patent document's locations, unless otherwise stated.

The parties also do not dispute the general substance of the claimed invention, as reflected by the Abstract, which provides:

> A computer-based system employing video capture, video motion detection, digital I/O and communications technology is applied to monitoring and security applications. Video information from one or more analog or digital cameras, is

---

[2] Such fact of identical specification in the Patents-in-Suit is acknowledged by Canatelo in fn. 1 of its claim construction opening briefing in both the instant case, see, Docket No. 81, and in Canatelo, LLC v. Avigilon Corp., 3:12-cv-01431-JAG ("Avigilon Action"), see, Docket no. 72.

> independently converted into digital form, optionally displayed in computer monitor on separate resizable windows, analyzed for motion and/or transmitted via the Internet or other networks. Motion detection or event triggers may be derived from a plurality of sources including analysis of digitized camera video signals, motion detector devices, signals from alarm systems, X10 motion sensors or cameras with built-in motion detection. Once a trigger event occurs, software compresses the digitized camera image, stores it in a local database, converts it to an Internet mail binary file format, and sends the file to the address of a recipient. Alternatively, a beeper or direct phone call may be sent in response to alarm condition. A remote monitoring feature allows the system user to monitor either database or live video images from a plurality of remote locations.

This court notes that this general substance of the claimed invention is also subscribed to by expert Dr. Cesar Gonzales, whose report was used in the companion Avigilon Action, along with a shorter declaration in the instant action. See, Docket No. 82, Exh. 1.

Figure 7 in the '858 Patent shows, as a specific implementation of the system, what was invented at the time of the patent filing.[3] As one embodiment of the architectural setup of a video monitoring and security system, Figure 7 contains some limitations in claim 1 of the '858 Patent that include: video camera(s), computer system (PC based system, or other computer system, for both client and server ends), network, mail server, beeper (alarm) unit, etc. The specification stated that computer systems such as 1a – 1d might contain the needed software, whose logic control is depicted in Figures 9A and 9B, and other parts of the specification.

---

[3] The inclusion of this Figure is not to be construed as an exclusion of other disclosures made in the '858 Patent.



After the Markman hearing, the parties indicated some willingness to seek compromise on certain claim terms, which will be incorporated later on. The court will now construe the seven terms currently at issue and then discuss the term as to which the parties compromised.

**First and second construed terms: Video camera and computer**

The court starts the analysis by grouping the two first terms together, since the dispute does not revolve around the meanings of these two terms, per se. As expressly shown by the briefings from both sides, the core of the dispute centers around whether the Patents-in-Suit, as invented and disclosed, should give rise to the patentee's claim to a certain "embedded system," which has not appeared in any claim language, but solely in a short paragraph between lines 44 and 48, column 3 of the '858 Patent. The statutory provision of 35 U.S.C. §112(a) gives the suitable guidance:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

It is true that Patents-in-Suit are presumed valid. See, 35 U.S.C. § 282; Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2243 (2011). But that validity must comply with the requisite "enablement" standards, so that the public is advised, and enabled, as to the scope of the patentee's contribution to the relevant field of technology. And as TRENDnet correctly notes, the two terms "computer" and "video camera" were used in their plain and ordinary fashion, within the four corners of the patent documents. Throughout the Patents-in-Suit's filing and prosecution history, including all the discussion and dealing with the patent examiners and the ensuing appeals, there was never any instance or hint that the patentee gave special definition to these two terms. Therefore, the public, or a person ordinarily skilled in the art ("POSITA"), would not come to a realization that these two terms would mean differently by the written description given in the Patents-in-Suit.

In Nautilus v. Biosig, 134 S.Ct. 2120 (2014), the Supreme Court noted that the "patent drafter is in the best position to resolve the ambiguity." Id. at 2129 (citing Halliburton Energy Servs. Inc. v. M-I LLC, 514 F.3d 1244, 1255 (Fed. Cir. 2008)). Therefore, the burden is on the patent drafter to avoid the ambiguity, and not the public, the POSITA or the court, to venture to perceive the claimed scope as it urges today, instead of the time of the filing of the patent. If the usage of the term "computer" would encompass it being integrated or embedded with the "video camera(s)," the patent drafter could have easily made it clear and given corresponding and enabling disclosure to comply with the requirement of 35 U.S.C. §112. Moreover, if the "computer" is an integrated component with a video camera, the extensive use of the functional connection "coupled to," or "operationally coupled with," would lose its meaning.

The prosecution history, as noted by TRENDnet, contained nothing on the part of the patentee that would lead the Examiners of the Patent Office to believe – and thus to examine the

claimed invention in that vein – that the "computer" could encompass other components (such as video camera), when all the prior art patents cited showed the Examiner's understanding of the computer as a "device programmed to process data, such a device is external to and distinct from the limitation of video camera." This ordinary and customary meaning as understood by the Examiner is also evident in sections of the prosecution wrapper file, attached as Exhibit E of TRENDnet's Claim Construction Opposition Brief. See, Docket No. 82, Exh. 1. Moreover, as shown on page 2 of the Feb. 2000 Office Action, the Examiner cited to the Washino 5,625,410 Patent's video monitoring system, based upon the understanding of "video camera" being separate and distinct from the "computer" (or "personal computer", PC). Id. at p. 18.

Accordingly, the two components, computer and video camera, should be separate and distinct from each other, as this is the plain and ordinary way intended by the patentee, as reflected in Figure 7, included above. This "separate" quality is further shown by patentee's explicit teaching of "coupled," "operationally coupled" and "interfaced with" terms. In essence, throughout the patent documents, there is simply not the slightest hint to the public that these two terms somehow do not mean what they were known to mean.

To give some benefit of the doubt to Canatelo, this court looks further into the grounds asserted by Canatelo to oppose TRENDnet's proposed construction. Canatelo's main argument centers on TRENDnet's "deficiency" in failure to heed the "disclosure of using embedded system to perform the claimed invention" (Docket No. 81 at p. 10). Canatelo further opposed TRENDnet's proposed construction on the ground that a proper claim construction should not read limitations into the claim. Id. at p. 12. Mindful of such alleged deficiency and the supposed limitations read into a claim, this court has examined the facts presented and the controlling laws

cited by Canatelo, and holds that TRENDnet's asserted construction gives the claim the proper scope that is commensurate with the enablement contained in the Patents-in-Suit.

From the evidence presented, including the expert's opinions and the inventor's deposition testimony, it is an untenable position to treat the "embedded system" as an actual "limitation" or "embodiment" that complied with Section 112's requirements. On the contrary, the inventor testified that such an "embedded system" is in fact a concept, namely, a proposal for future innovation. The inventor further testified that "the idea was originally presented in the most inexpensive way" (Docket No. 82, Exh. 1 at p. 7). The embedded system "was the original idea." Id.

While Canatelo attempted to define what an "embedded system" is in its opening brief, no such definition was given in the '858 Patent specification. As correctly argued by TRENDnet, the "embedded system" is either invented by the patentee, or not, at the time of the patent filing. If it was well known in the art that the patentee did not need to make requisite disclosure, the patentee could not lay claim to such "embedded system," because the patentee did not invent the "embedded system", on account of the reasoning that "[p]atent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable." Genentech v. Novo Nordisk, 108 F.3d 1361, 1366 (Fed. Cir. 1997). If it was something within the patentee's technical contribution and a functional feature of the invention, the patentee should have given sufficient detail that one skilled in the art can reasonably conclude that the inventor "had possession, as of the filing date of the application relied on, of the specific subject matter later claimed by him." Moba B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1319 (Fed. Cir. 2003).

The Supreme Court's guidance in Nautilus sheds more light on this principle. Nautilus set forth a new indefiniteness standard, replacing the old "insolubly ambiguous" standard. Nautilus thus held that a patent is invalid for indefiniteness if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention. The definiteness is to be evaluated from the perspective of a person skilled in the relevant art, that claims are to be read in light of the patent's specification and prosecution history, and that definiteness is to be measured as of the time of the patent application. Nautilus, 134 S.Ct. at 2123-2124.

The Court's reliance on the Nautilus authority is not to be viewed as having a stance on the issues of infringement or validity, as stressed earlier. Rather, the Nautilus authority guides this court to give a clear and more definite boundary to the asserted claim elements; this is consistent with the canon of construction to preserve validity of the claims. See, Modine Mfg. Co. v. United States Int'l Trade Comm'n, 75 F.3d 1545, 1557 (Fed. Cir. 1996). To construe these two terms as urged by Canatelo would add to the indefinite nature of the claim elements, based upon the undisputable factual finding that the inventor only put forth a "concept" for future innovation, contributing a single paragraph in the patent document.

Nautilus also mandates a clarity standard where the "patent must be precise enough to afford clear notice of what is claimed," so as to avoid a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." Nautilus, 134 S.Ct. at 2129 (citing United Carbon v. Binney & Smith, 317 U.S. 228, 236 (1942)). Moreover, patents are "not addressed to lawyers, or even to the public generally," but to those skilled in the relevant art. Id. at 2128 (citing Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 437 (1902)). The record in this court shows that Canatelo did not resort to any POSITA's position to support its

assertion, but TRENDnet did. To the extent a POSITA's view point is set forth in this action to reflect the understanding in the relevant trade, paragraph 36 of the Gonzales Report (first submitted in the Avigilon Action) is illustrative, where Dr. Gonzales stated that "A POSITA would understand the computer described in the Asserted Patents as separate from and independent of peripheral devices, such as a video camera."

The Patents-in-Suit presented a "preferred embodiment" of the video monitoring system using a PC system. This description in the specification of using a PC-based system, such as the one depicted in Figure 7, is not a restriction to the patentee's claim to its protected right when other competing or alternative computer system is used for different implementations. However, any attempt to take this "no reading limitation into claim language" into another level is unwarranted.

This court values the importance of continued innovation that naturally comes from human creativity and ingenuity. This court will therefore not restrict patentee's rightful claim to certain implementations, now or future, as long as they fit the statutory enablement standards, reflective of, and consistent with, the inventors' intellectual contribution. This court considered the "embedded system" to be a worthy innovation in its own right. In this instance, however, the right to claim the "embedded system" did not materialize, as of time of the patent filing.

Canatelo's contention that the "system may be implemented with an embedded system instead of a PC system," with citation to the exact line/column location in the '111 Patent, actually shows that there is no contribution made to advance the relevant field of technology, and makes the entitlement to its right to exclude the practice of the nebulous "embedded system" an unjustified proposition. The admission by the inventor of "may be implemented" suggests that the asserted "embedded system" was not implemented, and thus there was nothing to be read into

the claim. Thus, there is no exclusion of future embodiment by this construction, when there was no realizable embodiment shown in the patent to advise the public that the patentee was in possession of the invention that contained an "embedded system" limitation. This is further substantiated by paragraphs 3 and 4 of the expert declaration submitted by Dr. Gonzales, see Docket No. 82, Exh. 1, as it is demonstrated that a POSITA is not enabled to "make, use or build a camera with an internal processing unit," and that a POSITA would not be put on notice as to what is an "embedded system" based upon the lack of depiction in the specification. To rule otherwise would go against the authority that "the public must receive meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time," Capon v. Dudas, 418 F.3d 1349, 1357 (Fed. Cir. 2005), and likewise breach the Supreme Court's mandate of providing "practical assurance" that the patent subject matter is "more than a drafting effort." Mayo v. Prometheus, 132 S.Ct. 1289, 1297 (2012).

It is also important to note that the enablement standard itself is not a restriction on the patentee's rightful claim, which should go beyond specific enumerated embodiments or limitations set forth in the specification. The "restriction," or as properly construed to the rightful scope of the claimed invention, is the compliance of the statutory scheme in exchange for the grant of the exclusive right. Consequently, in heeding Section 112's command and the Supreme Court's mandate, the court avoids creating a "zone of uncertainty." For all the reasons stated above, this court ADOPTS TRENDnet's proposed claim constructions.

**Third construed term: Computer operationally coupled with the at least one video camera**

Having construed the two separate terms of "computer" and "video camera," this court now turns to this longer construct of the disputed term. TRENDnet's argument is narrowly focused on a "functional relationship" between two distinct units, instead of on the full term. To

support its position, TRENDnet referenced Innova/Pure Water, for the proposition that the "operatively connected" term is a "general descriptive term frequently used in patent drafting to reflect a functional relationship between claimed components." Innova/Pure Water, 381 F.3d at 1118. For this narrower issue, Canatelo actually adopted the same analysis and relied upon the same authority.

Since this court adopted the meanings of the "computer" and "video cameras" as generally urged by TRENDnet, there is no significant dispute about the meaning for this longer claim term as both parties exhibited the same "functional relationship" argument. The inquiry into the meaning that claim terms would have to a POSITA at the time of the invention is an objective one. This being the case, a court looks to those sources available to the public that show what a POSITA would have understood disputed claim language to mean. See Innova/Pure Water, 381 F.3d at 1116. Though not a decisive factor, this court notes that Canatelo's argument is less objective, as it did not seek to present a POSITA's factual understanding of the claim term, based upon the best intrinsic evidence available.

As such, this term is construed as presented in Canatelo's proposal, consistent with TRENDnet's position, without using the qualifiers after the "computer" and "video camera" terms.

**Fourth construed term: user-defined insensitive area**

For the term of "user-defined insensitive area," Canatelo urged this court to adopt its "plain and ordinary meaning," whereas TRENDnet proposed the following meaning: "An image map selected by a user from computer screen defining cells that are irrelevant to motion." At the claim construction hearing, Canatelo presented an alternative proposal for the construction of this term.

This court notes two important claim construction perspectives relative to alternative proposals:

1. Timing: "A claim term cannot have different meaning at different times; its meaning must be interpreted as of its effective filing date." PC Connector v. SmartDisk, 406 F.3d 1359, 1361 (Fed. Cir. 2005); "[t]he literal scope of a claim is fixed by the meaning of its terms in the relevant art as of the effective filing date of the application." Hill-Rom Servs. v. Stryker, 755 F.3d 1367, 1385 (Fed. Cir. 2014).

2. Uniformity: The Supreme Court in Markman emphasized that the goal of uniformity in the interpretation of claim meaning is an independent reason to allocate this task to a court, instead of to the jury. Markman v. Westview, 517 U.S. at 390. Otherwise, this could potentially create a "zone of uncertainty" for businesses and entrepreneurs that could potentially discourage invention. Moreover, the Court noted that for the sake of such desirable uniformity Congress created the Court of Appeals for the Federal Circuit as an exclusive appellate court for patent cases and that increased uniformity would "strengthen the United States patent system in such a way as to foster technological growth and industrial innovation." Id. (citations omitted).

In light of these authorities, this court is leery of Canatelo changing its proposed claim meanings, as such act violates both perspectives. Consequently, this court will not entertain the late-proposed constructions, and will only consider the arguments submitted by Canatelo in its timely briefed papers. See Fujitsu Ltd. v. Belkin Int'l, Inc., No. 10-CV-03972-LHK, 2012 WL 368574 at *6 (N.D. Cal. Feb. 3, 2012) ("Ordinarily, the court would find that any arguments not made in the claim construction briefing have been waived and may not be raised for the first time at the Markman hearing."); Finjan, Inc. v. Sophos, Inc., No. 14-CV-01197-WHO, 2015 WL

890621 at *8 (N.D. Cal. Mar. 2, 2015). Moreover, it is important to note that, as previously mentioned, the claim construction briefing schedule was set by the parties themselves. See, Docket No. 60. Canatelo therefore specifically agreed to and was fully cognizant of the deadlines set therein and cannot now attempt to side-step its obligation to comply with said order. See, Tower Ventures, Inc. v. City of Westfield, 296 F.3d 43, 46 (1st Cir. 2002) ("Scheduling orders are essential tools in [the case management] process – and a party's disregard of such orders robs them of their utility. For that reason, litigants have an 'unflagging duty to comply with clearly communicated case-management orders.'")(citing Rosario-Diaz v. Gonzalez, 140 F.3d 312, 315 (1st Cir.1998)).

Canatelo's briefed position for this term seems unusual and borders on unreasonable, as it spends some effort to explain what is the relevant claimed subject matter pertaining to this term, but then takes a position of detaching the claim meaning from the supporting disclosure. Particularly, it explained that the patent taught to build a software "graphical user interface allowing the user to make certain areas of the video camera image insensitive to motion" and that "the image is divided in multiple cells of size 10x10 which are marked by the user as being insensitive to motion and loaded into memory to do real-time masking." See, Docket No. 81 at pp. 17-18. Canatelo also pointed to the locations in the patent specification where the claim language may be supported.

Despite such identification of claim support, Canatelo's position of "plain and ordinary meaning" does not help with advancing the action when the factual decision of infringement and/or invalidity is needed. Come trial time, this court is not convinced that a jury is in a position to reach a common understanding of what is the "plain and ordinary meaning" for this term, when the ultimate factual determination of infringement and/or invalidity will be based thereon.

Our belief of the non-helpful "plain and ordinary meaning" position is also corroborated by Canatelo's last-minute attempt to provide alternative construction, which, as previously mentioned, the court will not consider.

There are indeed terms where this court would consider to be "lay terms" in which dispute by the parties may be meaningless. Many other courts refused to interpret "lay terms," such as "substantially," "about," "approximate," etc., as these terms can be left to the jury in the proper context. But the disputed claim term here does not fall into such "lay terms" category. Consequently, this court sought to take a meaningful construction that would help with advancement of the action, and turned to TRENDnet's proposal.

This court finds the proposal submitted by TRENDnet to be reasonable. The use of "graphical user interface" is explicitly disclosed, which to most people's understanding would include a computer screen. The component of a computer "screen" is extensively used, discussed and referenced in the '858 Patent, including Figures 1, 3, 4, 5 and 6, to fit the enabling requirement pertaining to this claim element. As such, the court finds the construction proposed by TRENDnet to be reasonable, with the caveat that such claim element, when applied at trial, is not limited to the specific embodiment of "screen," but should include equivalent devices that allow the graphical user interface to be built and operated on.

**Fifth construed term: Active area**

Canatelo proposes that a "plain and ordinary meaning" be adopted as to this claim. However, this court finds that such a construction is simply improper when, as here, these terms have no plain and ordinary meaning as used in the claim. Moreover, as argued by TRENDnet, according to 37 C.F.R. § 1.75, the terms and phrases used in the claims must find clear support in the description "so that the meaning of the terms in the claims may be ascertainable by reference

to the description." Id. This term, however, is simply not found in the written description claim of the patent. The only section of the patent that would be helpful to clarify the meaning is 7:51 – 59 of the '858 Patent. As such, this court agrees with TRENDnet that this term must be determined by a user by the means of a certain "graphic user interface" as presented and operated on a computer screen.

It is understood by both parties that the construed meaning of this term largely depends on and is related to the "User-defined insensitive area" term. The parties filed a stipulation agreeing to a certain construction, if this court adopts TRENDnet's proposed construction of the "User-defined insensitive area" term. See, Docket No. 100. As such, this court's construction of this term shall be: "An image map selected by a user from computer screen defining cells that are relevant to motion."

**Sixth construed term: Accepting a user-defined mask having active and inactive cells**

The claim interpretation for this term depends in large part the same technical disclosure and understanding for the "user-defined insensitive area," as noted in the fourth construed term. This court rejects the "plain and ordinary meaning" proposed by Canatelo, as explained in the previous sections. On the other hand, we agree that the 37 C.F.R. §1.75 support for the claim exists in the same paragraph for the description generally for the terms of user-defined insensitive area, active area, etc. As such, the construction proposed by TRENDnet is adopted herein, with the caveat mentioned in the fourth construed term for a non-restrictive reading of a computer "screen" to be applied at trial.

**Seventh construed term: Alarm server**

Canatelo first put forth a "plain and ordinary meaning" in its briefing, but proposed a different construction of "computer hardware or software programmed to transmit separate alarm

messages" during the Markman hearing on January 14, 2015, which TRENDnet timely opposed. As previously set forth, this court will not entertain such last-minute changes of proposed construction, based upon the same observations of the timing and uniformity principles detailed above.

Claim 7 of the '111 Patent provides, partially: "an alarm server operationally coupled with the computer, wherein the alarm server is configured to transmit a separate alarm message approximately simultaneous to the transmission of the e-mail." From the language of the claim, it is evident that that patent drafter plainly intended for the "alarm server" to be "operationally coupled" with the computer. Likewise, it is clear that the transmission of the alarm message is a separate event from the transmission of the email. Meanwhile, the '111 Patent specification at 3:15-17 provides: "In addition to e-mail, a beeper/pager may be sent to the user telling that an alarm event has occurred."

In the appellate brief, the patentee made arguments to counter the Washino prior art cited by the Examiner about the transmission of alarm message. See, Docket No. 82, Exh. 1. In paragraph C, the patentee stated: "As set forth above, a further aspect of applicant's invention involves the transmission of a separate alarm message. This alerts a user to check his or her e-mail account after the system detects motion and transmits an e-mail containing a compressed representation of that motion." Id., p. 121.

Based upon the specification and the prosecution history, this court agrees with TRENDnet's position that its proposed construction complies with the pertinent canons of construction. Consequently, we adopt TRENDnet's proposed construction as set forth herein.

### III.  CONCLUSION

Based on the foregoing reasoning, this court construes the disputed claim terms as follows:

1. "Computer"

   Construction: "One or more devices programmed to process data, such a device is external to and distinct from the limitation of a video camera"

2. "Video camera"

   Construction: "Device for capturing visual images in electronic form, such a device is external to and distinct from the limitation of a computer"

3. "Computer operationally coupled with the at least one video camera"

   Construction: "Computer connected so as to allow transfer of at least signals with at least one video camera"

4. "User-defined insensitive area"

   Construction: "An image map selected by a user from computer screen defining cells that are irrelevant to motion"

5. "Active area"

   Construction: "An image map selected by a user from computer screen defining cells that are relevant to motion"

6. "Accepting a user-defined mask having active and inactive cells"

   Construction: "Loading an image map into computer memory, said image map was previously selected by a user from computer screen to define cells that are subject to motion detection"

7. "Alarm server"

   Construction: "A device programmed to transmit separate alarm messages"

This court reiterates the caveat that the embodiment of the "screen" should include equivalent devices that allow the graphical user interface to be built and operated on, for the three terms of "User-defined insensitive area," "Active area," and "Accepting a user-defined mask having active and inactive cells."

The parties also initially disputed the meaning of several additional terms. However, by conclusion of the briefing, it was apparent that parties agreed that these terms will take their plain and ordinary meaning and this court shall take no action with regards to the three following terms: "Network connection to the Internet," "Approximately coincident with" and "Approximately simultaneously to."

This court furthers notes that, after the hearing, parties reached consensus about the meaning of one term that was previously disputed, though the differences between the competing proposal are somewhat limited: "Compressed representation of the electronic video signal." To make it clear, this term shall be ordered, per the parties' agreement, to mean: "Compressed representation of the electronic video signal: Frame or frames data content with reduced memory size."

**SO ORDERED.**

In San Juan, Puerto Rico, this 8th day of July, 2015.

                                                                      s/Pedro A. Delgado-Hernández
                                                                      PEDRO A. DELGADO-HERNÁNDEZ
                                                                      United States District Judge